O

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | | |
|---|---|---|
| **PHOENIX MINING & MINERAL, L.L.C.,** | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO.: 5:06-cv-58** |
| **v.** | § | |
| | § | |
| **TREASURY OIL CORP.; TREASURY CAPITAL, L.L.C.; TREASURY LEASING, LTD.; PHOENIX PARTNERS, L.L.C.; IRVING BIRNBAUM; RONALD M. ORGAN; and T. GARTH COLLIER,** | § | |
| *Defendants.* | § | |

## OPINION & ORDER

Pending before the Court are Motions to Dismiss for lack of Personal Jurisdiction filed individually by Defendants Irving Birnbaum, [Dkt. No. 28]; Ronald Organ, [Dkt. No. 26]; T. Garth Collier, [Dkt. No. 27]; Treasury Capital, L.L.C., [Dkt. No. 25]; and Phoenix Partners, L.L.C., [Dkt. No. 31]. Also pending is a Motion to Dismiss for Failure to State a Claim, [Dkt. No. 24], and Motion to Dismiss for Failure to Plead Fraud with Particularity, [Dkt. No. 29], both filed on behalf of all Defendants except Phoenix Partners. Phoenix Partners filed separately its Motion to Dismiss for Failure to State a Claim and Failure to Plead [Fraud] with Particularity and [in the Alternative Motion for a More Definite Statement,] which is also pending before the Court. [Dkt. No. 31].[1]

---

[1] Also pending is a Motion to Dismiss for Lack of Personal Jurisdiction by Defendant Treasury Leasing. [Dkt. No. 23]. However, the Court is unable to address Treasury Leasing's Motion at this time. The Court is currently awaiting the deposition of Defendant Collier, which may yield evidence of Defendant Treasury Leasing's contacts with this

## I.  PROCEDURAL BACKGROUND AND RELEVANT FACTS

Plaintiff Phoenix Mining & Mineral "is in the business of searching out and finding opportunities to purchase oil, gas and mineral interests in Texas, and to operate, produce and sell minerals from properties acquired." [Dkt. No. 34, ¶ 12]. In August of 2005, Plaintiff learned of an opportunity to purchase an interest in the development of an oil field, hereafter referred to as the "Aguilares Field," located in Webb County, Texas. [Dkt. No. 34, ¶¶ 13-14]. Shortly thereafter, Defendant Birnbaum, President of Treasury Oil Company (TOC), contacted Plaintiff's representative and expressed interest in participating in the Aguilares venture. [Dkt. No. 34, ¶¶ 13-19]. TOC thereafter sent Plaintiff a Letter of Intent, [Dkt. No. 34-2, Ex. 1], wherein TOC arguably agreed to purchase from Plaintiff a 50% "interest in the leases, production and surface production equipment located in or on interests to be acquired by Plaintiff in the Aguilares Field Transaction." [Dkt. No. 34, ¶ 21]. It was understood between Plaintiff and Defendant TOC that "time was of the essence" in obtaining financing for TOC's participation in the joint venture. [Dkt. No. 34, Ex. 1]. Such financing was apparently necessary for Plaintiff to complete the ultimate Purchase and Sale Agreement (PSA) with the third-party Seller. [Dkt. No. 34, ¶ 21]. Upon receiving TOC's letter of intent, Plaintiff ceased soliciting interest from other prospective investors. [Dkt. No. 34, ¶ 22].

Plaintiff alleges that, during the following months, Defendants repeatedly gave Plaintiff false assurances that they would be able and willing to fund their participation in the joint venture. [Dkt. No. 34, ¶ 24]. As the closing date for the Aguilares deal approached, it became apparent that Defendants were going to be tardy in obtaining the financing necessary to finalize their participation. It was therefore clear that an extension of the closing date was necessary. Relying

---

forum. However, as is explained below, the record currently enables the Court to dispose of Defendant Collier's jurisdictional challenge in his individual capacity.

on Defendants' assurances, Plaintiff repeatedly agreed to make non-refundable payments to the Aguilares Sellers in exchange for extending the closing date. [Dkt. No. 34]. Taken together, such payments totaled almost two million dollars. [Dkt. No. 34, ¶ 47].

Plaintiff states that "[r]epeated representations" by Defendants "led Plaintiff to believe that it was dealing with respectable and credible individuals and entities possessing both financial wherewithal and integrity . . . those representations were critical to Plaintiff." [Dkt. No. 34, ¶ 62]. "Critical" because, had Defendants not been capable of financing their anticipated participation in the venture, Plaintiff would have known to continue its search for prospective joint venturers, and would have certainly been less willing to pay large closing-date extension fees to Seller in an attempt to give Defendants extra time to finalize their seemingly imminent funding. Hereto, Defendants have not paid "a dime" to Plaintiff, and, as an apparent result, Plaintiff never purchased the Aguilares interests from Sellers.

On April 3, 2006, Plaintiff filed suit claiming (1) breach of contract; (2) common-law fraud in the inducement; and (3) statutory fraud in a real estate transaction. [Dkt. No. 1]. In its First Amended Complaint, Plaintiff complains not only of Defendants Birnbaum and TOCs' conduct, but also that of Treasury Capital, which it claims is the parent corporation of TOC, Treasury Leasing, and Phoenix Partners. [Dkt. No. 34, ¶ 68] All of these entities allegedly played some role in causing Plaintiff's injury.[2] Plaintiff claims that all entity Defendants are in actuality united as one, and therefore invokes the "single business enterprise" doctrine in order to impose joint and severable liability upon all corporate Defendants. [Dkt. No. 34, ¶¶ 69-72]. Plaintiff also seeks to "pierce the corporate veil" and recover against individual Defendants Birnbaum, Collier,

---

[2] Plaintiff has since sought permission to file its Second Amended Complaint, [Dkt. No. 97], a matter which is still pending before the Magistrate Judge. However, the Court, for reason made clear, *infra*, need not await disposition of Plaintiff's leave request in order to dispose of Defendants' pending Motions.

and Organ personally, since the aforementioned entities are allegedly the "alter ego[s]" thereof. [Dkt. No. 34, ¶¶ 69-72].

Defendants have filed a volley of motions urging this Court to dismiss the claims against them based on lack of personal jurisdiction, as well as based on Plaintiff's alleged failure to state a claim and/or plead fraud with particularity. The Court will first dispose of all jurisdictional matters.

## II.    DISCUSSION: PERSONAL JURISDICTION

For this Court to exercise personal jurisdiction over a nonresident defendant:

> two requirements must be met. First, the nonresident defendant must be amenable to service of process under a State's long-arm statute. Second, the assertion of *in personam* jurisdiction must be consistent with the [Fourteenth] Amendment's [D]ue [P]rocess [C]lause. Because Texas' long-arm statute has been interpreted to extend to the limits of due process, [a federal district court in Texas] need only determine whether subjecting [the defendant] to suit in Texas would offend the [D]ue [P]rocess [C]lause of the [Fourteenth] Amendment.

*Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999) (internal citations omitted). *See also Ruhrgas Ag v. Marathon Oil Co.*, 526 U.S. 574, 580 (1999) ("Texas' long-arm statute . . . authorizes personal jurisdiction to the extent allowed by the Due Process Clause of the Federal Constitution." (citing *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 200 (Tex. 1985)). Therefore, the central question is solely whether the Court may exercise personal jurisdiction over Defendants consistent with the Fourteenth Amendment.

The seminal decisions establishing modern personal jurisdiction doctrine are *International Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), all three of which culminated in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987).

"'[The] constitutional touchstone' of the determination whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established minimum contacts in the forum State,'" *id.* at 108-110 (quoting *Burger King*, 471 U.S. at 474), and, if so, whether exercising jurisdiction would otherwise "offend traditional notions of fair play and substantial justice," *International Shoe*, 326 U.S. at 316.

Minimum contacts "must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Asahi.* 480 U.S. at 109 (citing *Burger King*, 471 U.S. at 475). The manner in which courts apply the minimum contacts prong of the due process analysis is determined by what type of personal jurisdiction is alleged to exist, as there are two types: "specific" and "general." *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003). Plaintiff relies solely on the notion of specific personal jurisdiction. [Dkt. No. 93, n. 3]. A defendant is said to have minimum contacts with the forum state for the purposes of specific jurisdiction where it has "purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities . . . ."[3] *Id.* at 381.

As an evidentiary matter, a plaintiff "need only present facts sufficient to constitute a *prima facie* case of personal jurisdiction . . . when the jurisdictional issue is to be decided by the court on the basis of facts contained in affidavits . . . ." *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990). Additionally, for the purposes of minimum contacts analysis, factual disputes are resolved in favor of the plaintiff. *Id.* at 217.

---

[3] By contrast, a party is said to have minimum contacts for the purposes of general jurisdiction if her contacts with the forum are "systematic and continuous," even if those contacts are not at all related to the conduct giving rise to the cause of action. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

"Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show [that] the assertion of jurisdiction would be unfair;" *i.e.*, whether the exercise of personal jurisdiction would offend "traditional notions of fair play and substantial justice." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999). Only a "compelling case" can cancel out a showing of minimum contacts. *Burger King*, 471 U.S. at 477. "It is rare to say [that] the assertion [of personal jurisdiction] is unfair after minimum contacts have been shown." *Wien*, 195 F.3d at 214.

### A.      Defendant Birnbaum

In negotiating the Aguilares deal with Defendants, Plaintiff's direct interactions were primarily with Defendant Birnbaum, President of Defendant TOC. Birnbaum moves to dismiss for lack of personal jurisdiction. [Dkt. No. 28]. Specifically, he argues that the Court cannot exercise personal jurisdiction over him because whatever minimum contacts with Texas he may have maintained have in fact been those of TOC, on whose behalf he allegedly acted, rather than Defendant Birnbaum's in his individual capacity. [Dkt. No. 28, ¶ 7].

Birnbaum implicitly invokes the so-called "fiduciary shield doctrine," which provides that "an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has *in personam* jurisdiction over the corporation . . . ." *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985). Plaintiff responds by invoking one of several exceptions to this doctrine: it does not apply when the corporate officer injures a plaintiff via their "tortious activity, even if such acts were performed within the scope of their employment as corporate officers."[4] *Id. See also Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1312 (5th Cir. 1991) ("It is well settled law that when corporate

---

[4] Likewise, the doctrine does not apply when the corporation is merely the "alter ego" of the individual defendant, which Plaintiff also alleges. *Stuart*, 772 F.3d at 1197.

officers directly participate in or authorize the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable."). Thus, under this exception, a "single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis v. Fresne*, 252 F.3d 352, 359 (5th Cir. 2001); *see also Brown v. Flowers Indus.*, 688 F.2d 328, 332-33 (5th Cir. 1982) (personal jurisdiction conferred by single telephone call). Although there are cases in which such isolated acts were deemed insufficient to equal purposeful availment, such cases have been treated as inapposite when the wrong alleged is an intentional tort. *Lewis*, 252 F.3d at 359. Thus, "when the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Wien*, 195 F.3d at 213.

The thrust of Plaintiff's fraud claims is that Defendants on numerous occasions, through Birnbaum among others, falsely assured Plaintiff of their ability to obtain financing for their participation in the venture, and that such financing was imminent. In its First Amended Complaint, Plaintiff alleged numerous instances of such allegedly false assurances on the part of Birnbaum. [*See, e.g.*, Dkt. No. 34, ¶¶ 37-39, 41-42, 44-45; Dkt. No. 93-15, ¶¶ 9, 14-15, 17]. Plaintiff asserts that the substance of these communications is actionable, thus satisfying the first prong of personal jurisdiction analysis.

Defendant nevertheless relies on the second prong of the analysis to defeat personal jurisdiction, arguing that "[c]onveneince is a matter of equity" and that, since Birnbaum is a resident of New York, defending a suit in Texas would be "tremendously burdensome." [Dkt. No. 28, ¶¶ 13-16].

The "fair play" prong is satisfied if the defendant by virtue of his minimum contacts "should [have] reasonably anticipate[d] being haled into court in the forum state." *World-Wide*

*Volkswagen*, 444 U.S. at 297. The Fifth Circuit has commented that when a defendant "is charged with intentional, tortious conduct directed toward the forum state" this prong is presumed satisfied. *Wien*, 195 F.3d at 212. Birnbaum might be tempted to seize on the phrase "directed toward the forum state," by arguing that Plaintiff is incorporated in the State of Nevada, rather than Texas, and therefore his acts could not have harmed a Texas resident. [*See* Dkt. No. 28, ¶ 15]. However, Birnbaum's communications were directed toward Plaintiff's representatives in Texas; indeed, although incorporated in Nevada, Plaintiff's principal place of business is San Antonio. [Dkt. No. 93-15, ¶ 3].

Defendant Birnbaum, having knowingly directed his conduct into the State of Texas repeatedly, should have "reasonably anticipated being haled into court" here. Accordingly, the Court rejects Birnbaum's jurisdictional challenge.

### B.      Defendant Ronald Organ

Defendant Organ lodges the same personal jurisdictional attack as Defendant Birnbaum, and for the same reasons the Court rejects it. [Dkt. No. 26].

Plaintiff alleges that Organ made several direct communications with Plaintiff, the contents of which Plaintiff alleges were fraudulent. [Dkt. No. 34, ¶¶ 31-32, 52; Dkt. No. 93-15, ¶ 17]. Plaintiff has included with its Response the allegedly dishonest emails from Defendant Organ. [*See generally* Dkt. Nos. 93-4-93-19; Dkt. No. 35-15, ¶ 18].

Additionally, since the contents of these communications are the basis for Plaintiff's fraud claims, such are enough to show that Organ should have reasonably anticipated the possibility of litigation in Texas. The Court cannot conclude that its assertion of personal jurisdiction over Defendant Organ would be "tremendously burdensome." [*See* Dkt. No. 26, ¶ 14].

### C.      Defendant Collier

Plaintiff has included in its Response an email message sent from Defendant Collier to Plaintiff in which Collier assures Plaintiff that Defendants were, on December 30, 2005, "on the verge of finalising [sic] [the] funding . . . ." [Dkt. No. 93-14, Ex. A-13, at 1-2]. According to Plaintiff, such assurances were material misrepresentations causing it damages. Additionally, Plaintiff has provided an interesting email message sent from Defendant Organ to Defendant Collier, in which the former chastises the latter for failing to timely secure the funds necessary to close the Aguilares deal. [Dkt. No. 93-19, Ex. 38]. In the message, Organ tells Collier that he (Organ) will not "keep lying for [Collier] any longer" about the latter's ability to finance the venture. [Dkt. No. 93-19, Ex. 38]. Aside from substantively buttressing Plaintiff's fraud claims, this seeming admission has jurisdictional implications: that Defendant Collier instructed or encouraged Defendant Organ to direct material misrepresentations into Texas.

Consistent with the minimum contacts analysis above—*i.e.*, that the very substance of the given communications is the basis for the intentional tort alleged—the Court finds that the aforementioned evidence satisfies the minimum contacts prong of the personal jurisdiction analysis.

Naturally, Defendant Collier argues that litigating in Texas would be "tremendously burdensome" primarily because he is a "citizen of the United Kingdom . . . and a resident of Geneva, Switzerland," and continues to live in Geneva. [Dkt. No. 27, ¶ 14].

When a defendant advances a plausible "fair play" argument, the Court considers five factors in determining whether the second prong of the jurisdictional inquiry is satisfied. They are: (1) the burden on the defendant of having to litigate in the forum; (2) the forum state's interests in the lawsuit; (3) the plaintiff's interests in convenient and effective relief; (4) the judicial system's

interest in efficient resolution of controversies; (5) and the state's shared interest in furthering fundamental social policies. *Wien*, 195 F.3d at 215 (citing *Ruston Gas Turbines, Inc. v. Donaldson Company, Inc.*, 9 F.3d 415, 421 (5th Cir. 1993)).

The Aguilares property is located in Texas. Although the property itself is not the subject of this dispute (as neither party possesses or demands an interest therein), Plaintiff's real estate fraud claim involves the anticipated exchange of that property. Plaintiff alleges injuries that occurred in Texas, since Plaintiff's principal place of business is in Texas, and Colliers' allegedly wrongful conduct was directed toward Texas. Thus, Texas' interest in the resolution of this dispute is real. While it is true that Defendant Collier, residing in Europe, will obviously be inconvenienced by having to litigate in Texas, such is not enough to show that the assertion of personal jurisdiction in Texas would offend "traditional notions of fair play," as "once minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant." *Id.* (holding that the burden on the defendant, who resided in Germany, was not enough to overcome the forum's interest in the litigation and the showing of minimum contacts). Thus, the Court rejects Defendant Collier's jurisdictional challenge.

### D.     Treasury Capital

Plaintiff advances several arguments in support of personal jurisdiction over Defendant Treasury Capital. First, Plaintiff argues that the individual Defendants, in their dealings with Plaintiff, acted not only individually but as agents of Treasury Capital. [Dkt. No. 93 at 22]. Defendant Treasury Capital responds that "[a]ll of Organ's dealings with Plaintiff were in his capacity as Secretary and Treasurer of Treasury Oil Corporation," as opposed to Treasury Capital. [Dkt. No. 26, ¶ 7]. Defendant Collier likewise attempts to impute his conduct to TOC.[5]

---

[5] Although, interestingly, Collier in his affidavit makes no mention whatsoever of his relationship with TOC. Instead, he claims only to have been "a director for Treasury Leasing . . . ." [Dkt. No. 23, Ex. A].

[Dkt. No. 27, ¶ 7]. This invocation of the corporate fiction arguably represents an attempt to concentrate all minimum contacts (as well as liability) on TOC, while in turn sparing both the individual Defendants and parallel entities. Naturally, then, TOC has not bothered to mount a jurisdictional challenge, since the minimum contacts Birnbaum and Organ have maintained with Texas have allegedly been those of TOC instead. Therefore, assuming that TOC is subject to personal jurisdiction in Texas, the question becomes whether other entities allegedly associated with TOC are also so subject. Plaintiff would have the Court believe that one of these individuals, over which the Court has already decided it may exercise personal jurisdiction, was in reality acting on behalf of Treasury Capital. As already stated, Treasury Capital disagrees; there is a jurisdictional fact dispute.

As discussed above, Plaintiff "need only present facts sufficient to constitute a *prima facie* case of personal jurisdiction . . . when the jurisdictional issue is to be decided by the court on the basis of facts contained in affidavits . . . ." *Bullion*, 895 F.2d at 217. Additionally, factual disputes are resolved in favor of the plaintiff for the purpose of determining whether the plaintiff has met its burden of establishing minimum contacts. *Id.* at 217.

The documentation filed by Treasury Capital in an attempt to defeat personal jurisdiction yields a narrative of relationships and events that would border on the comically clumsy were it not so boldly dishonest. In its Motion, Treasury Capital declares that it "has *no . . . affiliation* with any of the [D]efendants." [Dkt. No. 25, ¶ 8 (emphasis added)]. However, the very, and only, affidavit Treasury Capital filed in support of its Motion is that of Defendant Birnbaum, who plainly states in the first few sentences that he is the "managing member," and "owner," of Treasury Capital. [Dkt. No. 25, Ex. A at 1]. As if this weren't enough, Treasury Capital's co-Defendant, Phoenix Partners, admits that Treasury Capital operates out of Phoenix's office, and

11

that Phoenix Partners pays all of Treasury Capital's operating expenses; indeed, Treasury Capital has no assets, according to Phoenix Partners. [Dkt. No. 93-21, Ex. D at 23, 26, 37]. Additionally, attached to Plaintiff's Response as Exhibit A is the affidavit of Larry Ewers, Managing Partner of Plaintiff Phoenix Mining & Mineral. [Dkt. No. 93-15, Ex. A]. Therein, Ewers asserts that Treasury Capital is "owned by Collier, is the parent company of Treasury Oil," and that "[a]ll communications to and from Collier were" sent to and from the email address "treasurycapital@europe.com." [Dkt. No. 93-15, Ex. A, ¶ 18]. Plaintiff provides several email messages which indeed ostensibly confirm that Defendant Collier used this Treasury Capital email address. [Dkt. No. 93-19, Ex. 38; Dkt. No. 93-14, Ex. 36].

An agency relationship between an individual and an entity defendant may serve as the basis of personal jurisdiction over the latter. *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 492 (5th Cir. 1974); *Guyton v. Pronav Ship Mgmt.*, 139 F. Supp. 2d 815, 818-19 (S.D. Tex. 2001) (citing *Burger King*, 471 U.S. at 480 n.22; *O'Quinn v. World Indus. Constructors*, Inc., 874 F. Supp. 143, 145 (E.D. Tex. 1995)); *Int'l Demographics, Inc. v. Sf Newspaper Co.*, 2006 U.S. Dist. Lexis 46572 (S.D. Tex. 2006) ("[A]n agent's contacts can be imputed to the principal for the purposes of the jurisdictional inquiry.").

The evidence that Treasury Capital is in fact *controlled* by Defendant Birnbaum, Collier's obvious relationship with Treasury Capital,[6] as well as the presumption that a plaintiff enjoys when facts pertaining to jurisdiction are in dispute all counsel in favor of finding minimum contacts here via principles of agency.

Further, Defendant Treasury Capital has provided no real basis to conclude that subjecting it to this forum would offend "traditional notions of fair play and substantial justice."

---

[6] Of course, what is currently uncertain is the exact *extent* of that relationship.

###### E.      Phoenix Partners

Plaintiff alleges that, throughout the aforementioned negotiations, Defendants Birnbaum, Organ, and Collier repeatedly led Plaintiff to believe that Phoenix Partners, a bank consulting firm, was involved in securing financing for the joint venture. [Dkt. No. 34, ¶¶ 57, 62; Dkt. No. 83-15, ¶ 19]. Such representations were apparently meant as assurances to Plaintiff that funding for the deal would be forthcoming.

In light of the above, Plaintiff relies, among other things, on the theory of apparent agency to establish Phoenix Partners' minimum contacts with Texas. [Dkt. No. 93 at 22]. As mentioned above, an agency relationship between an individual and an entity defendant may serve as the basis of personal jurisdiction over the latter. "Apparent agency . . . exists where the principal's conduct would lead a reasonably prudent person to believe that the agent possessed the authority to act on behalf of the principal." *IRA Res., Inc. v. Griego*, 161 S.W.3d 248, 255 (Tex. App.—Corpus Christi, 2005, pet. filed). "To establish apparent authority, one must show that a principal either knowingly permitted an agent to hold itself out as having authority [to act on the entity's behalf,] or showed such lack of ordinary care as to clothe the agent with indicia of [such] authority." *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 952-53 (Tex. 1996) (per curiam) (citing *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984)). The current inquiry then is whether Phoenix Partners exhibited such lack of ordinary care as to clothe any of the aforementioned Defendants with the seeming authority to act on its behalf.

In his deposition, Robert Ritter, as corporate representative of Phoenix Partners, admitted the following:

> Defendant Organ is an "employee" of Phoenix Partners; [Dkt. No. 93-21, Ex. D at 12];

Birnbaum, as representative of TOC, occupied an office in Phoenix Partners' New York City building, [Dkt. No. 93-21, Ex. D at 16];

Birnbaum shared an office with Defendant Organ, [Dkt. No. 93-21, Ex. D at 16];

Birnbaum did not pay rent for the use of Phoenix Partners' office space or any other costs associated with doing business, [Dkt. No. 93-21, Ex. D at 17-18];

TOC and Treasury Capital, which occupy office space in Phoenix Partners' building, pay no rent, [Dkt. No. 93-21, Ex. D at 26];

No signs, placards, etc. in the building in which Phoenix Partners does business indicates that the entities TOC or Treasury Capital occupy the building, or that Birnbaum or Organ conduct their business there, [Dkt. No. 93-21, Ex. D at 27];

Defendant Organ's business cards indicate that he represents Phoenix Partners, [Dkt. No. 93-21, Ex. D at 29]; and

There are no restrictions on what Mr. Birnbaum can and cannot do while conducting business in Phoenix Partners' office, [Dkt. No. 93-21, Ex. D at 37].

Consistent with these admissions, Defendant Birnbaum has admitted that TOC and Treasury Capital, both of which operate in Phoenix Partners' building, have no assets "whatsoever." [Dkt. No. 93-16, Ex. B at 23]. Plaintiff has also provided numerous emails from Defendant Organ to which an electronic signature is attached; each email is from a Phoenix Partners email address, and the electronic signature consistently represents that Organ is General Counsel for Phoenix Partners. [Dkt. No. 93-4-19].

Importantly, "[a] court may consider only the conduct of the principal leading a third party to believe that the agent has authority in determining whether an agent has apparent authority." *Id.* at 953. (citing *Southwest Title Ins. Co. v. Northland Bldg. Corp.*, 552 S.W.2d 425, 428 (Tex. 1977)). Thus, in concluding that apparent agency gives rise to personal jurisdiction, the Court need not treat, for example, Defendant Organ's emails to Plaintiff as those of Phoenix Partners, per se. However, the Court finds Phoenix Partners' seeming indifference toward the conduct of its co-Defendants while in its offices as reflecting a "lack of ordinary care," which clothed

individual Defendants, especially Defendant Organ, with "indicia of authority" to act on Phoenix Partners' behalf. *See Id.* at 952-53. Using ordinary care, no entity seeking to avoid the appearance that a particular individual acts on its behalf would give that individual free reign in exploiting the entity's resources and corporate name in conducting his personal business.

Because the Court finds that it may exercise personal jurisdiction over Defendant Phoenix Partners via principles of apparent agency, the Court currently expresses no opinion on Plaintiff's alternative grounds for denying Phoenix Partners' jurisdictional challenge.

## III.   VENUE

Defendant Phoenix Partners also moves for dismissal based on improper venue. In a diversity suit, the propriety of venue is governed by 28 U.S.C. § 1391(a), which provides that a case may be brought:

> only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

Defendant Phoenix Partners argues that the Southern District of Texas is an improper venue because, as it alleges, a substantial part of the events giving rise to this suit did not occur in this District, nor is the Aguilares property itself a subject of this suit. [Dkt. No. 31, ¶¶ 22-28]. Thus, as Phoenix Partners alleges, "there is not one event, act or omission by any party that takes place in [t]he Southern District of Texas." [Dkt. No. 31, ¶ 24].

Importantly, Plaintiff is correct in their assertion that, "[t]o determine whether a 'substantial' part of the claim's activities [sic] occurred in a particular venue, the [C]ourt does not ask which district among two or more . . . is the 'best' venue . . . ." [Dkt. No. 93 at 46]; *See Gulf Ins. Co. v.*

*Glasbrenner*, 417 F.3d 353, 356-57 (2d Cir. 2005); *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003); *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir 2001); *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998); *Setco Enters. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994).

Plaintiff's primary place of business is San Antonio, TX, which lies in the Western District of Texas. [Dkt. No. 93-15, ¶ 3]. Nevertheless, some of Defendants' communications with Plaintiff were directed toward the Southern District—although it is unclear how many—such as the initial telephone call from Defendants to Plaintiff in Houston, Texas.[7] [Dkt. No. 93-15, ¶ 4]. As one court put it, such "long-distance communications [are] as much connected to one judicial district as [another.]" *Torchmark Corp. v. Rice*, 945 F. Supp. 172, 179 (E.D. Ark. 1996); *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 153 (2d Cir. 2001); *Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 868 (2d Cir. 1992); *New Life Brokerage Servs. v. Cal-Surance Assocs.*, 222 F. Supp. 2d 94, 110 (D. Me. 2002); *Sacody Techs., Inc. v. Avant, Inc.*, 862 F. Supp. 1152, 1157 (S.D.N.Y. 1994) ("The standard set forth in § 1391(a)(2) may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action."). The Southern District of Texas is not an improper venue.

---

[7] Perhaps because Phoenix Mining & Mineral expects it to be implicit, Plaintiff does not, with this exception, expressly indicate in which cities its representatives Ben Lasseter and Larry Ewers were located when receiving the majority of the allegedly fraudulent communications from Defendants. However, there is evidence to suggest that Defendants' communications were sent to Lasseter and/or Ewers in the Southern District. [*See, e.g.*, Dkt. No. 93-10 (Federal Express waybill sent from Ewers to Phoenix Partners reflecting a Corpus Christi "from" address)].

## IV.     DISCUSSION: PLAINTIFF'S SUBSTANTIVE CLAIMS

All Defendants move for dismissal of Plaintiff's breach of contract claim under Federal Rule of Evidence 12(b)(6) for failure to state a claim upon which relief can be granted. [Dkt. Nos. 24, 30]. Additionally, Defendant Phoenix Partners further moves for dismissal of Plaintiff's fraud claims for failure to plead with particularity under Rule 9(b).  [Dkt. No. 31].

### A.  Breach of Contract

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim on which relief can be granted."  Dismissal is warranted when it is clear that a plaintiff can "prove no set of facts in support of his claim that would entitle him to relief." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (citing *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990)). In evaluating the sufficiency of the pleadings, a court treats all well-pleaded facts as true, "viewing them in the light most favorable to the plaintiff." *Id*. (citing *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996)). A court should not dismiss a claim unless the plaintiff would not be entitled to relief under "any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Id*. (citing *Vander Zee v. Reno*, 73 F.3d 1365, 1368 (5th Cir. 1996)).

Defendants argue that, taking Plaintiff's pleadings as true, it has failed to state a breach of contract claim for several reasons: First, because the Letter of Intent is non-binding on its own terms, [Dkt. No. 31 at 11]; second, because the Letter, if a contract, is not enforceable due to indefiniteness, [Dkt. No. 31 at 12]; and, third, because the Letter, if originally contemplated as a binding agreement, violates the statute of frauds, [Dkt. No. 31at 16].

At times, Plaintiff paints its relationship with Defendants as that of "co-purchasers" of the Aguilares interests. This is certainly the impression lent by the fact that Defendants were to be

present at the closing of the Aguilares sale, and that Plaintiff's closing with the third-party Sellers depended upon Defendants' funding. Indeed, Plaintiff characterizes the "agreement" between the parties as one to "purchase interests" in the Aguilares property, and Defendants' promise as one to "fund the closing of the Aguilares [f]ield [t]ransaction." [Dkt. No. 34, ¶ 24]. However, the four corners of the Letter of Intent, as well as the majority of Plaintiff's narrative, indicate that in fact Plaintiff was to sell a portion of the Aguilares interests to Defendants *immediately upon purchasing the entirety thereof, on its own, from Sellers*. This distinction is not trivial.

The Letter of Intent reads as follows:

> Treasury agrees to purchase and Phoenix agrees to sell the following:
>
> All right title [sic] and interest of fifty (50%) percent interest [sic] shall include but not be limited to all "held by production" leases and/or other leases, if any, production, undrilled acreage and surface production equipment located in and on [i]nterests held by Phoenix in the Aguilares Field, located in Webb County, Texas . . . .
>
> The subject matter of this Letter of Intent, the Aguilares Field, Webb County, Texas as set forth herein is subject to the execution of a formal Purchase & Sale Agreement and a Joint Venture Agreement between Treasury Oil Corporation and Phoenix Mining and Mineral[].

[Dkt. No. 34-2, Ex. 1].

Defendants' assertion that the Letter of Intent is "non-binding on its own terms" centers on their characterization of the "subject to" language as establishing conditions precedent. In other words, Defendants argue that the Letter of Intent on its face requires the execution of subsequent memorializations that work to make the preliminary agreements binding. [Dkt. No. 31, ¶ 35].

Defendants are correct that a condition precedent controls the current inquiry, but are incorrect as to *what* that condition precedent is. Whether a "subject to" clause renders the balance of an instrument non-binding is a fact question of intent for a jury to decide, notwithstanding the

parties' mistaken belief to the contrary.[8] The real threat to Plaintiff's contract claim is posed by its own internal logic: assuming that the Letter of Intent is a binding contract, the fundamental nature of the contract gives rise to an implicit "condition precedent" that renders Defendants' breach impossible.

The Letter of Intent is a far cry from an instrument wherein a party agrees to purchase, directly from a third-party seller, part of an interest in property. Here, if Defendants indeed agreed to "purchase from" Plaintiff certain interests, Defendants could not perform—*i.e.*, "buy"—until Plaintiff had something to sell. Although not written into the Letter of Intent, the purchase of the Aguilares property by Plaintiff, from Sellers, is the true condition precedent to TOC's fulfillment of its supposed obligation, as that obligation is described unambiguously in the Letter of Intent.

Such is the catch-22 that Plaintiff has created for itself: It relied on a casual understanding that Defendants would provide financing that "was to facilitate [Plaintiff's] closing" with Sellers. [Dkt. No. 34, ¶ 21]. Plaintiff then attempted to secure such "facilitation" from Defendants with an instrument requiring Defendants only to buy interests in the Aguilares field directly from Plaintiff. Under such an arrangement, Plaintiff could not trigger Defendants' stated obligation under the Letter of Intent if Defendants failed to fulfill their alleged casual commitment to "facilitate" Plaintiff's purchase of the property from Sellers in the first place.

---

[8] Both parties are correct that the construction of contract provisions is a legal inquiry rather than a factual one. *S.P.A. v. Ragner Ins. Co.*, 64 F.3d 979, 980-81 (5th Cir. 1995). However, the determination of whether an instrument is an embodiment of a *binding* agreement centers on the intent of the parties, which is often a matter of fact for the jury. *Foreca, S.A. v. GRD Development Co., Inc.*, 758 S.W.2d 744, 745-746 (Tex. 1988). Thus, determinations of what a contract means, and whether an instrument is meant to be a contract in the first place, are two fundamentally different inquires. *See also Scaife v. Associated Air Ctr.*, 100 F.3d 406, 410 (5th Cir. 1996) ("The 'convenient memorial' doctrine usually requires a finder of fact to ascertain whether the parties intended to be bound by the agreement before the agreement was formally executed.").

That the contemplated arrangement was for Plaintiff to sell the Aguilares interests to Defendants, rather than bring Defendants in as "co-purchasers," is indicated by the fact that on "September 6, 2005, Plaintiff and Sellers entered into a Purchase and Sale Agreement . . . whereby Plaintiff agreed to purchase all of Sellers' rights, title, and interests" in the Aguilares property." [Dkt. No. 34, ¶ 15]. As part of this PSA with Sellers, Plaintiff agreed to pay "a performance deposit in the amount of $500,000, which Plaintiff duly paid." [Dkt. No. 34, ¶ 16]. Importantly, this all took place before Defendants signed the Letter of Intent with Plaintiff on October 10, 2005. [Dkt. No. 34-2, Ex. 1].

Thus, Plaintiff's own pleadings leads only to the conclusion that the Letter of Intent could not have been "breached" because the obligations allegedly created thereby never arose—the Aguilares property was never Plaintiff's to sell. The response to this might be that, regardless of the Letter's four corners, the record contains contextual evidence that the real agreement—or perhaps a parallel agreement—was that Defendants would provide funding to Plaintiff to subsidize the latter's closing of the Aguilares deal with Sellers. However, the Court is not free to reform the fundamental nature of contending parties' written agreements by injecting therein its conception of their casual understandings. Put differently, even if the Court could circumvent the purely *factual* inquiry as to whether the Letter of Intent is a binding contract, the Court's purely *legal* conclusion would be that the terms of the contract are not ambiguous for present purposes—the Letter simply cannot be read to give rise to the obligation that Plaintiff claims Defendants "breached." *See Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995) ("Only where a contract is first determined to be ambiguous may the courts . . . admit extraneous evidence to determine the true meaning of the instrument . . . If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous . . .

Parol evidence is not admissible for the purpose of creating an ambiguity."). Rather, such non-contractual understandings and injuries sound in tort or equity claims rather than breach of contract.

The Court emphasizes that, in reaching this conclusion, it has not "weighed" the evidence. Rather, it assumes the truth of Plaintiff's allegations and asks whether its legal claim of contract breach is consistent with it factual allegations. *See Greninger*, 188 F.3d at 324 (a reviewing court should not dismiss a claim if the plaintiff asserts "any possible theory that he could prove *consistent with the allegations in the complaint*." (emphasis added)). The Court concludes that, based on Plaintiff's own pleadings, Plaintiff has failed to state a coherent breach of contract claim.

### B.  Rule 9(b): Plaintiff's Fraud Claim

Defendant Phoenix Partners next argues that Plaintiff's fraud claims should be dismissed for failure to plead with particularity as required under Federal Rule of Civil Procedure 9(b). [Dkt. No. 31, ¶ 49]. Defendant Phoenix Partners moved for dismissal on this ground before Plaintiff filed its First Amended Complaint. [Dkt. No. 34]. Given the copious detail in the live pleadings, the Court considers Phoenix Partners' Rule 9(b) attack moot.

### V.      CONCLUSION

The Motions to Dismiss for Lack of Personal Jurisdiction filed by the following Defendants, individually, are **DENIED**: Defendant Treasury Capital, [Dkt. No. 25]; Defendant Ronald M. Organ, [Dkt. No. 26]; Defendant T. Garth Collier, [Dkt. No. 27]; and Defendant Irving Birnbaum, [Dkt. No. 28]. Defendant Phoenix Partners' Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, Failure to State a Claim, Failure to Plead with Particularity and [in

the Alternative, Motion for a More Definite Statement,] [Dkt. No. 30], is **DENIED in part and GRANTED in part**. To the extent Defendant Phoenix Partners moves for dismissal for lack of personal jurisdiction, improper venue, and for failure to plead fraud with particularity, the Motion is **DENIED** as moot, as is its Motion for a More Definite Statement. To the extent Phoenix Partners moves for dismissal of Plaintiff's breach of contract claim for failure to state a claim, the Motion is **GRANTED**. Defendants Treasury Oil, Treasury Capital, Treasury Leasing, Irving Birnbaum, Ronald Organ, and T. Garth Colliers' Motion to Dismiss for Failure to State a Claim is **GRANTED** with respect to Plaintiff's breach of contract claim, but **DENIED** with respect to Plaintiff's remaining claims.

IT IS SO ORDERED.

Done, this 28th day of March, 2007, in Laredo, Texas.


_____
Micaela Alvarez
UNITED STATES DISTRICT JUDGE


**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**